[No. 1678.]

SQUARE LANGFORD v. THE STATE.

1. BURGLARY.— INDICTMENT for burglary, where the entry is alleged to have been accomplished by force, need not allege the non-consent of the owner or occupant of the premises entered.

2. SAME — EVIDENCE — CASE STATED.— In a prosecution for burglary to commit theft, the State produced direct evidence that the defendant was the party who made the burglarious entry, but only circumstantial evidence that he was the party who committed the theft. In order to establish his guilt as to the theft, the State was permitted to prove a suspicious declaration made by the defendant on the same night but before the burglary was committed, and some distance from the house burglarized. The State was also permitted to prove certain interviews on the day after the burglary between the defendant and one W., the party in whose possession the stolen property was found, on the said day after the burglary. *Held,* that such evidence was legitimate, and was not objectionable as an attempt to establish a conspiracy after the consummation of the crime, by the use of the acts and declarations of one co-conspirator against another. Anything the defendant may have done and said after the consummation of the crime, tending to establish his guilt, was as properly evidence against him as though it was said and done before the consummation of the crime.

3. SAME.— Another rule upon the same subject is: When the guilt of the defendant is made to depend upon circumstantial evidence alone, the mind seeks, and is permitted to seek, light and knowledge from every source, however dim, calculated to throw light upon the transaction.

4. Same — Practice — Privilege of Counsel.— Whatever error may have been committed in permitting the prosecuting attorney to animadvert, in argument, upon the fact that the defendant introduced no witnesses to testify in his behalf, was cured by the instruction of the court to the effect that the defendant was not bound to produce witnesses to testify to his innocence, and that it was incumbent on the State to establish the guilt of the defendant beyond a reasonable doubt, before it could be entitled to a conviction.

5. Same — Charge of the Court.— Objections to the charge of the court, unless they present errors essentially material, or of a character, in view of the evidence, to seriously affect the rights of the defendant, will not be considered, when urged for the first time in this court. Unsatisfactory charges should be excepted to, or special charges correcting the supposed erroneous ones should be requested.

6. Same — Fact Case.— See the statement of the case for evidence *held* sufficient to support a conviction for burglary.

Appeal from the District Court of Lamar. Tried below before the Hon. R. R. Gaines.

The conviction in this case was for the burglary of, and theft from, the house of George and Eliza Lowery, in the city of Paris, and county of Lamar, on the night of September 19, 1884. A term of nine years in the penitentiary was the penalty imposed.

Eliza Lowery was the first witness for the State. She testified that she lived in the city of Paris, Lamar county, Texas, and was acquainted with the defendant, who was also a resident of that city. About 4 o'clock on the night of September 19, 1884, she was awakened from her sleep, and saw a man dressed in dark clothes, standing by the bed of her daughter Fannie, in an adjoining room. She took that man to be the defendant. The witness called to the man, when he ran out of the house at the door through which he entered it, which said door, prior to his entry, was closed. Witness followed the man to the door. At this time she was joined by one of her boarders, who was aroused by the noise. Calling her attention to a dark object in the yard, the boarder asked the witness if that was not a cow. Investigation disclosed that this dark object was the witness's trunk, which had been removed from her room by some one, opened and despoiled of some of its contents. Many of the articles of clothing which it contained were scattered about the ground, and other articles of value had been taken off. Among the articles of jewelry missing was a gold watch and chain of the value of $40; four breast pins of the value of $4; one bracelet worth $1, and one finger ring worth $5, the said property worth, in the aggregate, $50. The jewelry described was the property of the witness, and was taken from her house and possession without her consent.

The witness next saw the property described, and identified it as the property taken from her trunk on the night mentioned, at the examining trial of the defendant. Witness was of the opinion at the time that the man ran out of her house that he was the defendant. She did not know that the defendant had ever been in her house prior to this night, but she had previously, and often, seen him about her husband's restaurant. On the morning of the next day, September 20, 1884, witness saw the defendant and one Henry Williams standing together on the gallery of Joe Pennybacker, in the said city of Paris. Some time during the same day, she saw the defendant and the said Williams together on Bonham street in the said city, at which time the defendant was in the act of giving to the said Williams a parcel of some kind rolled up in a cloth. On seeing the witness, the defendant placed the parcel under his arm, and he and Williams turned into a space between two houses.

On her cross-examination the witness stated that she could not remember that she had ever seen the defendant in her house prior to the occasion of the burglary. Though satisfied in her own mind that the man she saw run out of her house on that occasion was the defendant, the witness was unable to depose positively that he was. The trunk had been removed from the witness's room to the yard, broken open and the articles mentioned removed from it, before the witness saw the man in her daughter Fannie's room, but how long, the witness was unable to say. She could not say at what hour of the night the removal and spoliation of the trunk occurred. Witness saw but one person in the house that night, save the boarder mentioned, and that person she took to be Square Langford, the defendant. He was then standing at the bed of Fannie Anderson, the witness's daughter, in an adjoining room. He was plainly visible through an open door. The person had nothing in his hands when he ran from Fannie's room out of the house. If he had then had the trunk, witness would certainly have seen it. The trunk described was taken from the witness's room and not from Fannie's room. The night of the burglary was a bright twilight but moonless night. The witness never saw the defendant in possession of her jewelry.

Re-examined by the State, the witness testified that the jewelry case, and the lace pillow-slip, said to have been found between two houses on Bonham street, belonged to her. They were in the trunk at the time of its spoliation, and were taken from it together with the other articles mentioned at the same time.

. Fannie Anderson was the next witness for the State. She testified that she lived at the house of her mother, the witness Eliza Lowery,

in the city of Paris, Texas. Her room in that house was entered by a man whom she fully identified as the defendant, about 4 o'clock on the night of September 19, 1884, or more properly, on the morn- ing of September 20, 1884. When the witness first saw the defendant on that morning, he was standing at her bedside. He was dressed in a suit of navy blue cloth. That man was Square Langford, the defendant, and none other. On discovering him the witness called to her mother, whereupon the man spoke to her in an ;open, loud tone of voice, saying "hush." The witness instantly recognized the voice as that of the defendant. He ran out of the house when the witness called to her mother. On the morning of September 20, 1884, the witness saw the defendant and Henry Williams con- versing together on the gallery of the restaurant of her father, George Lowery. Other persons were about the restaurant, but they were not engaged in the conversation between defendant and Will- iams. Witness heard the defendant say to Williams: "We will go to Honey Grove on this evening's train, and have a good time." She heard Williams reply: "Let's wait until to-morrow night;" to which the defendant finally agreed.

Cross-examined, the witness stated that the defendant and Will- iams conducted the conversation at the restaurant in an ordinary conversational tone of voice, which could have been easily heard and understood by the persons standing around, if they had listened. Witness heard it plainly. The witness was absolutely positive that the party she saw standing at her bedside, as detailed, was the de- fendant, Square Langford. He first awakened her by putting his hands on her arms and shoulders. He said nothing more than "hush," when she, witness, called to her mother. The witness was not mistaken in asserting that the defendant was, when standing at her bedside, dressed in a suit of navy blue clothes. She saw his clothes plainly, and could readily distinguish their color in the light which came through the door and windows. It was not a fact that the color of the clothes he wore that night was suggested to the mind of the witness by the fact that he wore a navy blue suit on his examining trial next day. Witness retired about 12 o'clock on the night of the burglary. She did not know who took the jewelry. The restaurant of the witness's father was a public place in the city of Paris. Witness was the daughter of Eliza Lowery and was eighteen years old. When the man ran out of the house the wit- ness told her mother that she thought he was the defendant.

Sue Bennett was the next witness for the State. She testified that she lived in a house on the south side of Bonham street, in the

city of Paris, Texas. On or about the morning of September 20, 1884, she saw the defendant and Henry Williams standing together in a space between two houses on the south side of the said street. The defendant gave Williams something wrapped in what the witness at the time took to be a lace cap. A lace pillow-case and a jewelry case, said to be the property of Eliza Lowery, were afterwards found secreted under one of the houses mentioned. When Mr. Harris, the deputy sheriff, arrested Williams, the witness was present, and saw him, Williams, throw down a watch, which the witness picked up and handed to Mr. Harris. The witness could not say what the article was that defendant gave Williams between the two houses. Witness was some forty yards distant from the parties at the time. She did not know who placed the jewelry case and the pillow-slip under the house.

Francis Miller, for the State, testified that he saw the defendant and Henry Williams together on Church street, in the city of Paris, on the night of the alleged burglary, about 11 o'clock. The point on Church street where the witness saw them was several hundred yards distant from the house of George and Eliza Lowery. The witness was then going towards the public square in Paris. The parties named, defendant and Williams, were going towards "Board-town," which led them in a direction opposite Lowery's house. It was a twilight night. Witness had never, to his knowledge, seen Williams before.

Hark Record testified, for the State, that on or about the night of September 19, 1884, he heard the defendant and other parties talking together in the southern part of the town of Paris, and at a point near the Texas & Pacific depot. One of the persons, whom the witness did not know, called to the defendant and said: "Come, let's go and do what we said we would to-night." Defendant answered: "Let's wait until to-morrow night."

Cross-examined, the witness said that he was unable to recognize any of the parties talking except the defendant. They talked in a loud voice, and appeared to be some distance apart. No attempt to conceal what was said was made. This occurred in the southern portion of the city of Paris, near the Texas & Pacific Railroad depot, and, the witness thought, on the night of September 19, 1884, between 11 and 12 o'clock. The house said to have been burglarized on that night stood in the western part of the city.

George Lowery testified, for the State, that he was the husband of the witness, Eliza Lowery. He did not give his consent to the defendant or any one else to enter his house on the night of Sep-

tember 19, 1884, and if the defendant did enter that house and remove the property described in the indictment, he did so without the knowledge or consent of the witness.

Deputy-sheriff N. P. Harris testified, for the State, that he arrested Henry Williams, in the city of Paris, about 10 o'clock on the morning of September 20, 1884. He found on the person of the said Williams, one watch and two watch chains, four breast pins, a watch key, a pocket-book, a silk handkerchief and a bracelet. Under a window near which the arrest was made witness picked up a finger ring. A necklace was picked up near the same place and handed to the witness. Sue Bennett, who was present at the time of the arrest, picked up a watch from the ground which she gave to the witness. Witness had never seen Williams before.

Cross-examined, the witness stated that one of the watches and one of the chains, the watch key and the silk handkerchief which he recovered from Williams at the time of the arrest, belonged to Bud Shillings, from whom they were stolen some nights prior to the alleged burglary of Lowery's house. Witness had never seen the defendant and Williams together prior to the arrest of the latter. James A. Boothe was present when the witness arrested Williams.

James A. Boothe, constable of precinct number one, Lamar county, Texas, testified that he arrested Square Langford, the defendant, on the morning of September 20, 1884. On the same morning, but previous to the arrest, witness had noticed the defendant watching him, witness, and Mr. Nelson. When witness arrested Langford, he made a careful and close search of his person, but failed to find any of the articles lost by Eliza Lowery. The arrest was made on suspicion.

The questions discussed in the opinion were relied on in the motion for new trial.

The motion in arrest of judgment set up that the indictment was insufficient in that it charged no offense; that it was duplicitous, and that it failed to allege that the entry was made without the consent of the owner or occupants.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. Appellant's motion in arrest of judgment was properly overruled, the indictment being in every respect sufficient to charge burglary under the statute (Penal Code, art. 704),— a burglary at night with intent to commit the crime of theft.

It is not duplicitous; and it is not invalid or defective because it fails to aver that it was not, or to negative, the fact that the entry was " by the free consent of the occupant or of one authorized to give such consent." (Penal Code, art. 706.) Non-consent of the owner or occupant is never required where the indictment alleges the burglarious entry was accomplished by force. (*Buntain* v. *The State*, 15 Texas Ct. App., 485.)

One or more bills of exception were taken to the admission of evidence on the trial over defendant's objections. This evidence had reference to defendant's connection with the stolen property or fruits of the crime, after the theft had been committed. Whilst the evidence is positive that defendant was the party who entered the house, his guilt with regard to the perpetration of the theft after the entry was wholly circumstantial; and in order to establish this fact the court permitted a suspicious declaration of defendant, made at some distance from the place of the burglary, but on the same night and before the crime was committed, to be given in evidence. Evidence was also permitted showing interviews between defendant and one Williams on the day after the crime was committed,— Williams being the guilty party in whose possession and upon whose person the stolen property was found the day after it was stolen. This evidence was perfectly legitimate. It was not objectionable because it was an attempt to establish a conspiracy after its consummation, by the use of the acts and declarations of one co-conspirator against another. The evidence was not so much to show what Williams did, as what defendant himself was doing. Anything he did after the consummation of the crime and tending to establish his guilt was legitimate evidence against him, as much so as what he might have said and done before its consummation. Another rule would render admissible all the evidence objected to in the bill of exceptions. As stated before, the theft branch of the case depended entirely upon circumstantial testimony; "in such cases the mind seeks, and is permitted to seek, light and knowledge from every source, however dim, calculated to throw light upon the transaction." (*Green* v. *The State*, 12 Texas Ct. App., 51; *Simms* v. *The State*, 10 Texas Ct. App., 132.)

Animadversions by the prosecuting attorney upon the fact that defendant had introduced no witnesses in his behalf may or may not have been uncalled for and improper. A defendant is never required to introduce evidence to establish his innocence; it is the duty of the prosecution to establish his guilt. This error, if an error at all, of the prosecuting attorney was, however, fully corrected by the following

language used by the learned judge in his charge to the jury, viz.: "The defendant is not bound to introduce evidence showing, or tending to show, his whereabouts at the time of the commission of the offense. The State must make out its own case, for the defendant is presumed to be innocent until his guilt is established by legal evidence, and, in case of a reasonable doubt as to his guilt, he is entitled to be acquitted."

Some complaints are urged to the charge of the court. No exceptions were saved to it, nor were any special instructions requested. In the absence of such exceptions and special instructions the supposed errors — not being essentially material — nor in the light of the evidence of a character calculated to seriously affect the rights of appellant — will not be held reversible error.

We are of opinion the evidence adduced fully sustains the charge of burglary perpetrated with intent to commit theft, and the actual theft by defendant of the goods and property charged, after his burglarious entry. On the record the judgment should be and is affirmed.

*Affirmed.*

[Opinion delivered January 28, 1885.]